UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>*Defendant*. | Civil Action No. 19-2578 (TFH) |

## **DECLARATION OF PATRICK A. HOWARD**

I, Patrick A. Howard, declare as follows:

1. I am a Branch Chief in the Freedom of Information Act (FOIA) Division, Privacy and Diversity Office, Office of the Commissioner, U.S. Customs and Border Protection (CBP). I have been a Branch Chief in the FOIA Division in Washington, D.C. since February 8, 2015. In this capacity, I oversee a staff of Government Information Specialists, the processing of requests for records submitted to CBP pursuant to the FOIA, the processing of certain requests submitted to CBP pursuant to 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a, and other activities conducted pursuant to applicable records access provisions.

2. I am familiar with CBP's procedures for responding to FOIA requests. I provide technical and administrative supervision and direction to a group of Government Information Specialists responsible for processing requests for release of CBP documents and information, assist with FOIA litigation matters, and I am personally familiar with the processing of FOIA responses.

3. All information contained herein is based upon information furnished to me in my official capacity, and the statements I make in this declaration are based on my personal

knowledge, which includes knowledge acquired through, and agency files reviewed in, the course of my official duties as Branch Chief in CBP's FOIA Division.

4. I submit this declaration in support of Defendant's motion for summary judgment in this case.

**CBP'S STANDARD PROCEDURE FOR INITIATING SEARCHES IN RESPONSE TO FOIA REQUESTS**

5. Broadly, the FOIA Division at CBP reviews FOIA requests, determines whether responsive records exist and, if so, whether they can be released in accordance with the FOIA. In processing such requests, the FOIA Division consults with CBP component agencies, CBP personnel and, when appropriate, with other components within DHS, as well as other Executive Branch agencies.

6. Despite the large size of CBP as an organization, the FOIA Division currently consists of approximately 31 full-time staff and FOIA processors, 6 FOIA assistants, and 4 supervisory employees.

7. A Government Information Specialist (GIS), also known as a FOIA processor, is tasked with reviewing information and providing assistance to managers and employees concerning FOIA issues, policies, and procedures. He or she is also responsible for processing FOIA requests for CBP records. A GIS is responsible for reviewing and preparing draft responses to requests for releases of information and, in so doing, must apply relevant statutes, regulations, agency rules, and/or executive orders as they pertain to FOIA requests.

8. A Branch Chief is responsible for managing policy formulation, advising agency management, and ensuring compliance with federal laws governing the release of information. Branch Chiefs oversee the release of CBP documents and information, assist with FOIA

litigation matters, and oversee the processing of FOIA responses and adherence to federal laws and regulations.

9. Where the FOIA Division has no direct access to records that may be responsive to a request, it must determine which CBP component offices are likely to have responsive information and work with those offices to gather any potentially responsive records. Based on the FOIA Division's knowledge, familiarity, and experience with the types of records that each office maintains, an assessment is made as to where responsive records are likely to be maintained based on a review of the content of the request itself and the nature of the records sought, as well as discussions with knowledgeable agency personnel. Accordingly, when CBP receives a FOIA request that reasonably describes the records requested and complies with the agency's rules governing the procedures for FOIA requests, the office likely to have responsive information is tasked with searching for and retrieving potentially responsive records.

10. The CBP FOIA office addresses a broad variety of FOIA requests. Approximately 85% of requests received are internally referred to as "traveler" requests, from individuals or their registered representatives asking for records of entry and exit, records of inspection, apprehension, etc. The requests are focused on the activities of a single person, or multiple persons/family and are often processed internally within CBP FOIA, with no other office involvement.

11. The remaining (approximately) 15% of requests are internally referred to as "Non Traveler" requests and essentially encompass anything that does not fall into the first category. A frequent characteristic of Non Traveler requests is the need for CBP FOIA to reach out to other offices for assistance identifying potentially responsive records, as CBP FOIA does not have direct access to all systems or records within CBP.

12. There are a number of operational and policy offices within CBP. Upon receiving the request, CBP FOIA staff evaluate the request and consider which components, offices, databases, and personnel are likely to have responsive information.

13. CBP is the largest federal law enforcement agency in the United States and is responsible for a broad law enforcement and border security mission. CBP's responsibilities include, among other things, ensuring the interdiction of persons and goods illegally entering or exiting the United States, while facilitating and expediting the flow of legitimate travelers and trade.

14. CBP is comprised of more than 60,000 employees charged with enforcing hundreds of federal statutes. Approximately 45,000 of those employees are armed law enforcement officers engaged in carrying out CBP's expansive border security mission. CBP contains three components that are primarily responsible for executing CBP's law enforcement mission at the border: Office of Field Operations (OFO), United States Border Patrol (USBP), and Air and Marine Operations (AMO).

## PLAINTIFF'S REQUEST AND CBP'S INITIAL SEARCH FOR RESPONSIVE RECORDS

15. I am familiar with the request for records submitted by the Electronic Frontier Foundation ("EFF"), dated November 5, 2018, that is the subject of this case. *See* Exhibit A.

16. The request seeks two categories of records:

- "Policies and/or procedures regarding the use of GPS tracking devices on vehicles crossing the border."

- "Training manuals and/or training materials on the use of GPS tracking devices on vehicles crossing the border."

17. Given the nature of EFF's request, the FOIA Division sent a copy of the request to OFO, USBP, and AMO representatives who are responsible for coordinating their respective

component's search for records in response to FOIA requests such as the EFF request. The FOIA Division requested that each office conduct a search for records responsive to the request and advise the FOIA Division of the results. OFO, USBP, and AMO each have personnel responsible for implementing searches within their respective organizations, based on their expertise and knowledge of their respective organization's structure, activities, and recordkeeping practices.

18. The FOIA Division tasked OFO, USBP, and AMO to conduct a search for responsive records because they are the three CBP components who are generally responsible for exercising CBP's law enforcement authority at the border, and the request seeks records relating to CBP's use of certain law enforcement techniques on vehicles crossing the border.

19. In this case, OFO, USBP, and AMO personnel conducted a search for responsive records based on the language in the request. These searches included consultations with relevant subject-matter experts and field personnel who, based on their job position and experience, were expected to be familiar with any policies, procedures, or training materials or manuals relating to the use of GPS tracking devices on vehicles crossing the border. After conducting a search for records, OFO, USBP, and AMO each provided responses to the FOIA Division indicating that no responsive records were located in their search.

20. In the November 7, 2019 Joint Status Report in this case, CBP advised EFF and the court that CBP had conducted a search for records, but had identified no records responsive to EFF's request. CBP further indicated, however, that the agency was evaluating whether any additional searches may be necessary.

## OFO'S SUPPLEMENTAL SEARCH FOR RECORDS

21. OFO is CBP's largest component and is responsible for law enforcement, border security, and facilitating lawful trade and travel at U.S. ports of entry. Among other things, OFO inspects persons, merchandise, and vehicles seeking entry into the United States. On a typical day in fiscal year 2019, CBP processed 1,124,075 passengers and pedestrians and 273,338 incoming privately owned vehicles. CBP, *Snapshot: A Summary of CBP Facts and Figures*, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2020-Jun/CBP-Snapshot-20200611-web.pdf.

22. OFO operates eighteen Field Offices around the United States that are responsible for managing ports of entry within their geographic area of responsibility, plus an additional Preclearance Field Office responsible for managing CBP's preclearance locations in foreign countries. There are over 300 ports of entry in the United States. Individuals seeking entry into the United States are generally required to report to a port of entry where their person, vehicle, merchandise, baggage, and personal effects are generally subject to inspection.

23. Given the request's focus on records relating to "the use of GPS tracking devices on vehicles crossing the border" and OFO's responsibility for inspecting vehicles at ports of entry, CBP elected to conduct a supplemental search for records within OFO. OFO headquarters personnel sent a request to each geographical Field Office[1] requesting they conduct a search and provide "any information you have regarding the use or placement of GPS tracking devices." A copy of EFF's FOIA request was also provided to the Field Office personnel for reference.

---

[1] OFO did not request a search by the Preclearance Field Office because preclearance locations do not generally inspect vehicles crossing the border and, therefore, would not be reasonably expected to have any responsive records.

24. In response to the request from OFO headquarters, each geographic Field Office conducted a search for records, including a search of electronic files.

25. OFO's Field Offices identified 49 records, which were provided to the FOIA Division for review for responsiveness and processing. The FOIA Division reviewed the records, and determined that 45 records were not responsive to EFF's request, 1 record was responsive but subject to withholding in full under FOIA exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E), and 3 records were referred to U.S. Immigration and Customs Enforcement.

26. On April 1, 2020, the CBP FOIA Division sent a response letter to EFF advising it that "a supplemental search for records returned approximately 49 records that required further review for responsiveness." *See* Exhibit B. The letter further advised EFF that "CBP FOIA has reviewed those records for this release and has made the following determinations:"

- "47 records are not responsive to the request;

- "1 three-page record is responsive but is withheld in full under exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E); and

- "1 record was referred to U.S. Immigration and Customs Enforcement for processing."

27. On November 12, 2020, the CBP FOIA Division sent a corrected final response letter correcting an error in the breakdown of the 49 records identified in CBP's supplemental search. *See* Exhibit C. The corrected letter advised EFF that "the correct determinations for the records accounted for in the April 1, 2020 letter are as follows:"

- "45 records are not responsive to the request;

- "1 three-page record is responsive but is withheld in full under exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E); and

- "3 records, totaling four pages, were referred to U.S. Immigration and Customs Enforcement for processing."

28.     The November 12, 2020 final response letter addresses the same 49 records at issue in the April 1, 2020 response letter.  However, due to a drafting error, the April 1, 2020 letter incorrectly characterized the records that were referred to ICE as a single record.  In fact, the records consisted of three records constituting a total of four pages. As a result, the April 1, 2020 letter also incorrectly identified the number of records determined to be non-responsive as 47 records rather than 45 records.  The November 12, 2020 final response letter corrected this error.

29.     The 45 non-responsive records identified in CBP's supplemental search were non-responsive because they did not constitute policies, procedures, training manuals, or training materials regarding the use of GPS tracking devices on vehicles crossing the border.

30.     CBP FOIA did not make any determinations regarding responsiveness or exemptions with regard to the three records referred to ICE, but instead deferred to ICE.

## RECORD WITHHELD UNDER FOIA

31.     As discussed above, CBP determined that one record was responsive, but subject to withholding in full under exemptions (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).

32.     The withheld record is a three-page email chain containing two substantive email messages, plus a third email message that simply forwards the email chain to another recipient. The first email message is from an attorney in the CBP Office of Chief Counsel (OCC) to CBP law enforcement personnel, and it consists of communications made for the purpose of providing legal advice.  The second email message transmits the first email to additional CBP law enforcement personnel, summarizes communications with counsel that were made for the purpose of obtaining legal advice, and discusses procedures for using certain law enforcement techniques.

### A. Exemption (b)(5)

33. Section 552(b)(5) of Title 5 of the U.S. Code exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." Relevant here, Exemption 5 protects from disclosure information normally protected in the civil discovery context, including information protected by the deliberative process privilege and attorney-client privilege.

34. Portions of the record, which was created less than 25 years ago, are exempt under subsection (b)(5) due to the deliberative process privilege. The information at issue is deliberative in nature and was compiled in advance of a final agency decision. The information in the record that is subject to the deliberative process privilege and exempt under (b)(5) consists of advice and recommendations to agency decision makers, and advice regarding the establishment of an appropriate decision-making process for the development of law enforcement procedures.

35. Portions of the record are exempt under subsection (b)(5) due to the attorney-client privilege. The attorney-client privilege protects confidential communications between an attorney and his or her client for the purpose of obtaining legal advice. The information in the record that is subject to the attorney-client privilege and exempt under (b)(5) consists of legal advice provided by OCC attorneys to CBP law enforcement personnel and descriptions of communications between U.S. government attorneys and CBP law enforcement personnel made in the course of obtaining legal advice.

### B. Exemption (b)(6)

36. Section 552(b)(6) of Title 5 of the U.S. Code exempts from disclosure certain records and information "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." This exemption requires balancing the public's right to disclosure against an individual's right to privacy.

37. The information in the record exempt under (b)(6) consists of names, email addresses, and phone numbers of CBP employees. Release of this information would constitute a clearly unwarranted invasion of personal privacy. Government employees have a protectable privacy interest in their identities that would be threatened by disclosure. Similarly, government employees have a protectable privacy interest in their contact information that would also be threatened by disclosure. Release of this information would not shed light on the actions of CBP, and there is no public interest in the disclosure of this information. Accordingly, the individual's right to privacy outweighs whatever public interest, if any, might exist in knowing the information.

### C.     Exemption (b)(7)(C)

38. Section 552(b)(7) of Title 5 of the U.S. Code exempts from disclosure certain records or information that are "compiled for law enforcement purposes." The record at issue in this case was compiled for law enforcement purposes in that the information was created and used by CBP in its law enforcement mission to secure the border of the United States and enforce federal law at U.S. ports of entry.

39. Section 552(b)(7)(C) of Title 5 of the U.S. Code exempts from disclosure law enforcement records or information that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." Exemption (b)(7)(C) is designed to protect, among other things, law enforcement personnel from harassment and annoyance in the conduct of their

official duties and in their private lives, which could conceivably result from the public disclosure of their identity or contact information. The privacy interest in the identity of an individual in the redacted document outweighs any public interest in disclosure of that information.

40. In the record at issue, exemption (b)(7)(C) applies to the same types of information to which exemption (b)(6) applies: names, email addresses, and phone numbers of CBP employees. This personally identifiable information of government employees could identify CBP personnel involved in law enforcement functions. The persons associated with these names, telephone numbers, and email addresses have a protectable privacy interest in their identities that would be compromised by the release of this information. Exemption (b)(7)(C) was applied to protect these individuals from unwanted contact, annoyance, or harassment in their personal and/or private lives. Release of this specific information would not shed light on the actions of CBP, and outweighs any conceivable public interest in the disclosure of this information. Accordingly, the individual's right to privacy outweighs whatever public interest, if any, might exist in knowing this information, which was compiled for law enforcement purposes.

**D. Exemption (b)(7)(E)**

41. Section 552(b)(7)(E) of Title 5 of the U.S. Code exempts from disclosure law enforcement records or information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."

42. The effectiveness of CBP's mission is dependent to a large extent on the use of sensitive investigative techniques and methods, the specific details of which are not known to the

general public.  These law enforcement techniques and procedures are critical tools used by CBP officers to efficiently and effectively carry out CBP's mission to secure the border and to prevent inadmissible people and goods, including prohibited narcotics and other contraband, from entering the United States, and to enforce customs, immigration, agriculture and other federal laws at the border.  The disclosure of these techniques and methods would seriously compromise CBP's ability to perform its law enforcement mission at the border.

43.     The information in the record exempt under (b)(7)(E) consists of: internal guidelines for the use of specific law enforcement techniques; information regarding the circumstances in which such techniques may be utilized; limitations on the use of such techniques; and descriptions of specialized law enforcement units and third party agencies.  If revealed, this information would disclose techniques, procedures, and guidelines for law enforcement investigations and prosecutions.

44.     Disclosure of such information would risk circumvention of the law.  Among other things, it would reveal specific law enforcement capabilities and provide information regarding the relatively likelihood of CBP utilizing particular techniques in certain circumstances or in specific operational locations.  It would also risk revealing the purpose and investigatory focus of such techniques.  This would permit illicit actors to determine the scope of CBP's technical capabilities, gauge the relative likelihood that particular investigative techniques would be utilized, and infer the existence and nature of CBP's law enforcement interest in certain circumstances.  Such information could then be used to develop countermeasures, avoid detection, and frustrate CBP's ability to detect illicit activity and enforce the law.

45.     In addition, information regarding procedures utilized in particular geographic locations and about practical and procedural limits on the use of certain investigative techniques

may lead illicit actors to target locations where they may face a decreased risk of detection (a practice known as "port shopping").

## SEGREGABILITY

46.     CBP personnel have reviewed the document determined to be responsive, line-by-line, to identify information exempt from disclosure and to consider whether partial disclosure of information is possible.  All information in the record at issue is exempt from disclosure pursuant to a FOIA exemption or is not reasonably segregable because it is so intertwined with protected material that segregation is not possible, its release would reveal the underlying protected material, or it consists of disjointed words or phrases with minimal or no information content. In my determination, any release of the exempted materials could reasonably lead to the disclosure of information that is properly protected by the exemptions asserted.

I declare under a penalty of perjury that the information provided is true and correct to the best of my information, knowledge, and belief.

Signed this 13th day of November, 2020.

*Patrick Howard*
Patrick A. Howard, Branch Chief
FOIA Division
Privacy and Diversity Office
Office of the Commissioner
U.S. Customs and Border Protection
U.S. Department of Homeland Security